## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## (COLUMBIA DIVISION)

| | |
|---|---|
| **ROSALIE SIMKINS, JESSICA CASE,** | : |
| **and KRISTIINA MOLNAR, individually** | : |
| **and on behalf of all others similarly situated,** | : |
| | : |
| **Plaintiffs,** | :     **CIVIL ACTION NO.:** |
| | : |
| **v.** | : |
| | : |
| **BLACKBAUD, INC.,** | : |
| | : |
| **Defendant.** | : |
| ———————————————————— | : |

## CLASS ACTION COMPLAINT

1.     Plaintiffs Rosalie Simkins, Jessica Case, and Kristiina Molnar, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this action against Defendant Blackbaud, Inc. ("Blackbaud" or "Defendant"), seeking monetary damages, restitution, and/or injunctive relief for the proposed Class and Subclasses, as defined below. Plaintiffs make the following allegations upon information and belief, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

2.     The release, disclosure, and publication of sensitive, private data can be devastating. Not only is it an intrusion of privacy and a loss of control, but it is also a harbinger of identity theft: for victims of a data breach, the risk of identity theft more than quadruples.[1] A data breach can have grave consequences for victims for years after the actual date of the breach—with

---

[1] Dave Maxfield & Bill Latham, *Data Breaches: Perspectives from Both Sides of the Wall*, S.C. Lawyer (May 2014).

the obtained information thieves can wreak many forms of havoc: open new financial accounts, take out loans, obtain medical services, obtain government benefits, or obtain driver's licenses all in the victims' names, forcing victims to maintain a constant vigilance over the potential misuse of their information.

3.     South Carolina cloud computing vendor Blackbaud was keenly aware of the risk of cyberattacks and breach of its customers' confidential data. In fact, Defendant has stated that the secure collection, storage, and transmission of confidential data is fundamental to its business.[2] Defendant likewise knew it was vulnerable to cyberattacks, identifying security breach or intrusion and loss or theft of confidential donor data as a vulnerability in its Annual Report filed with the U.S. Securities and Exchange Commission ("SEC"). In that same document, Defendant also acknowledged its obligation of notification in the event of a breach.[3]

4.     Yet, in February 2020, the same month Defendant acknowledged this risk, it failed to detect a ransomware attack on its server. For three and a half months, between February 7, 2020 and May 20, 2020, cyber criminals orchestrated what Defendant has downplayed as a "[s]ecurity [i]ncident," when they infiltrated the Defendant's inadequately protected computer networks, thereby gaining access to and copying data and servers managed, maintained, and secured by Defendant (the "Data Breach").[4]

5.     In a typical ransomware attack, one is "locked out" of one's data or system by a malicious actor until a ransom is paid. Once the ransom is paid, access is granted. But that is not all that transpired here. Rather, cyber criminals successfully breached Defendant's network and

---

[2] *See* Blackbaud, Inc., Annual Report ("2019 Form 10-K") at 20 (Feb. 20, 2020), https://investor. blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417.
[3] *Id.*
[4] Blackbaud, Inc., Form 8-K at 2 (Sept. 29, 2020), https://investor.blackbaud.com/static-files/58a4ae64-afc5-45f7-81df-69dfc93888fc.

exfiltrated (i.e., stole) data from it. Defendant admitted that data was exfiltrated during the "security incident," in its filing to the SEC on September 29, 2020, where it states: "further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, [S]ocial [S]ecurity numbers, usernames and/or passwords."[5]

6.     Defendant's servers contained personally identifiable information ("PII"), protected health information ("PHI"), and "personal information," as defined by RCW § 19.255.005 and Wyo. Stat. Ann. § 40-12-501, respectively, (collectively, "Private Information") of individual consumers, including Plaintiffs. As a result of this Data Breach, Plaintiffs have and will suffer ascertainable losses in the form of out-of-pocket expenses and/or the value of their time incurred to remedy or mitigate the effects of the attack. Additionally, Plaintiffs' and the other Class members' sensitive Private Information—which was entrusted to Defendant—was not only compromised and unlawfully accessed as a result of the Data Breach and made subject to unlawful use by unknown parties, but also obliged some Class members to purchase mitigating identity protection services. Information compromised in the Data Breach included a "copy of a subset of data" retained by Defendant, including name(s), addresses, phone numbers, Social Security numbers, and other Private Information.[6]

7.     Defendant's own statement regarding the breach is available on its website.[7] Contrary to the representations by Defendant, as reflected in its statement and the notices of the

---

[5] *Id.*

[6] *Id.*

[7] Blackbaud, Inc., *Security Incident* (updated Sept. 29, 2020), https://www.blackbaud.com/securityincident.

Data Breach (the "Notices") that Plaintiffs received, credit card numbers, bank account numbers, and/or other Private Information may have been compromised.

8.     Plaintiffs bring this proposed class action lawsuit to: (1) address Defendant's inadequate safeguarding of Class members' Private Information, which Defendant managed, maintained, and secured; (2) address Defendant's failure to provide timely and adequate notice to Plaintiffs and the other Class members that their information had been subject to the unauthorized access of an unknown third-party; (3) address Defendant's failure to identify all information that was accessed; and (4) address Defendant's failure to provide Plaintiffs and the other Class members with adequate redress for the Data Breach or act to mitigate their damages.

9.     Defendant caused substantial harm and injuries to Plaintiffs and Class members across the United States by, *inter alia*, failing to: (1) timely implement adequate and reasonable measures to ensure Plaintiffs' and the other Class members' Private Information was properly protected; (2) timely detect the Data Breach; (3) take adequate steps to prevent and stop the Data Breach; (4) disclose the material facts that it lacked adequate systems and security practices to safeguard Plaintiffs' and the other Class members' Private Information; (5) honor its repeated promises and representations to protect the Plaintiffs' and the other Class members' Private Information; (6) identify all information that was accessed; (7) maintain its computer network in a condition to adequately protect against ransomware attacks or other cyberattacks; (8) provide timely and adequate notice of the Data Breach; (9) properly monitor the computer network and systems that housed Plaintiffs' and the other Class members' Private Information; (10) implement appropriate policies to ensure secure communications of Private Information to Defendant's clients; (11) properly train employees regarding preventing and responding to ransomware attacks; and (12) provide Plaintiffs and the other Class members with adequate redress for the Data Breach.

10.     Had Defendant properly monitored its network, security, and communications, it would have discovered the cyberattack sooner or prevented it altogether. In fact, Defendant has announced it has "already implemented changes to prevent this specific issue from happening again."[8] Had the necessary changes been made previously, this incident would not have happened, and Plaintiffs' Private Information would not have been accessed.

11.     Plaintiffs' Private Information is now at risk because of Defendant's negligent conduct, as the Private Information that Defendant collected and maintained is now in the hands of cyber criminals. Defendant cannot reasonably maintain that the data thieves destroyed the extracted data simply because Defendant paid the ransom and the perpetrators stated the copy was destroyed. In fact, the Notices provided by the non-profit organizations and educational institutions through which Defendant obtained Plaintiffs' data advised that Class members should remain aware of suspicious account activity, and take further actions such as monitoring their own credit records, and notifying the organizations involved or the law enforcement authorities of any suspicious activity.[9] Despite this, Defendant offered Class members little in the way of redress, such as credit monitoring or proactive fraud protection, and no financial support for time or expenses incurred in the event of fraud.

---

[8] *Id.*

[9] For instance, the Notice provided to Plaintiff Case warned that she should "remain vigilant and promptly report any suspicious activity or suspected identity theft to [the non-profit] and to the proper law enforcement authorities, such as the Federal Trade Commission and the Washington State Office of the Attorney General." Likewise, the Notice Plaintiff Molnar received advised her to "remain vigilant and promptly report to [the educational institution] and to the proper law enforcement authorities any suspicious activity or suspected identity theft." Similarly, the Notice issued to Plaintiff Simkins advised that she should "remain vigilant and promptly report any suspicious activity or suspected identity theft to [the charity] and to the proper law enforcement authorities such as the Federal Trade Commission, and the Office of the Washington State Attorney General."

12.     As a result of the Data Breach, Plaintiffs and the other Class members have suffered concrete damages and are now exposed to a heightened and imminent risk of fraud and identity theft, for a period of years, if not decades. Furthermore, Plaintiffs and the Class members, must now and in the future closely monitor their financial accounts to guard against identity theft, at their own expense. Consequently, Plaintiffs and the other Class members will incur on-going out-of-pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

13.     By this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly-situated individuals, whose Private Information was accessed during the Data Breach.

14.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits of its data security systems, and provision of adequate, robust credit monitoring and restoration services funded by Defendant.

15.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, (iii) negligence *per se*, and (vi) violations of Washington and Wyoming state privacy protection and consumer protection statutes.

## PARTIES

16.     Plaintiff Rosalie Simkins is a resident and citizen of Seattle, King County, Washington. Plaintiff Simkins is acting on her own behalf and on behalf of others similarly situated. Plaintiff Simkins' Private Information was breached during the Data Breach.

17.     Plaintiff Jessica Case is a resident and citizen of Seattle, King County, Washington. Plaintiff Case is acting on her own behalf and on behalf of others similarly situated. Plaintiff Case's Private Information was breached during the Data Breach.

18.     Plaintiff Kristiina Molnar is a resident and citizen of Jackson, Teton County, Wyoming. Plaintiff Molnar is acting on her own behalf and on behalf of others similarly situated. Plaintiff Molnar's Private Information was breached during the Data Breach.

19.     Defendant Blackbaud is a Delaware corporation with its principal place of business located on Daniel Island, Charleston County, South Carolina.

20.     Defendant manages, maintains, and provides cloud computing software, services and cybersecurity for the data obtained by its clients who are, *inter alia*, healthcare and education institutions, corporations, and non-profit companies,[10] including the non-profits which maintained Plaintiffs' Private Information—the data that was breached in this instance. Defendant has more than 45,000 clients in more than 100 countries.[11]

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq.*, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

22.     This Court has personal jurisdiction over this action because Defendant maintains its principal place of business in this District, has sufficient minimum contacts with this District

---

[10] *See* Blackbaud, Inc., *About Blackbaud*, https://www.blackbaud.com/company (last visited Feb. 9, 2021).
[11] 2019 Form 10-K at 3. *See also* para 26.

and has purposefully availed itself of the privilege of doing business in this District such that it could reasonably foresee litigation being brought in this District. This Court also has diversity jurisdiction over this action. 28 U.S.C. § 1332(a).

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## DEFENDANT BLACKBAUD

24.     Since originally incorporating in 1982, Defendant has become "the world's leading cloud software company powering social good."[12] It provides cloud software, services, expertise and data intelligence, which its clients use for administration, fundraising, and financial management.[13] Some of Defendant's most popular products are "Raiser's Edge NXT" and "Financial Edge NXT."[14]

25.     Defendant is a publicly traded company with clients that include "nonprofits, foundations, corporations, education institutions, healthcare institutions, and the individual change agents who support them."[15]

26.     Defendant reported that "[a]t the end of 2019, [it] had over 45,000 customers located in over 100 countries," with a "total addressable market ("TAM") . . . greater than $10 billion."[16]

27.     In the ordinary course of doing business with Defendant's clients, individuals are regularly required to provide Defendant's clients with sensitive, personal, and private information

---

[12] 2019 Form 10-K at 3.
[13] *Id.*
[14] *Id.* at 7, 8.
[15] *Supra* note 10.
[16] 2019 Form 10-K at 3.

that is then stored, maintained, and secured by Defendant. This Private Information includes or may include the following personal data:

- Name;

- Address;

- Phone number(s);

- Email address;

- Date of birth;

- Demographic information;

- Social Security number;

- Credit card account numbers;

- Bank account numbers;

- Educational history;

- Healthcare records or other Health Information Portability and Accountability Act ("HIPAA") protected data;

- Insurance information and coverage;

- Photo identification;

- Employer information;

- Income information;

- Donor contribution information; and

- Place of birth, mother's maiden names, passwords, or other Private Information.

28.    At all relevant times, Defendant knew the data it stores was vulnerable to cyber-attack. In its 2019 Annual Report, filed with the SEC in February 2020, Defendant specifically admitted its known susceptibility to cyberattacks. Specifically, Defendant stated:

> If the security of our software is breached, we fail to securely collect, store and transmit customer information, or we fail to safeguard confidential donor data, we could be exposed to liability, litigation, penalties and remedial costs and our reputation and business could suffer.

> Fundamental to the use of our solutions is the secure collection, storage and transmission of confidential donor and end user data and transaction data, including in our payment services. Despite the network and application security, internal control measures, and physical security procedures we employ to safeguard our systems, we may still be vulnerable to a security breach, intrusion, loss or theft of confidential donor data and transaction data, which may harm our business, reputation and future financial results.[17]

29.    Further, Defendant acknowledged the sophistication of attacks and the need to constantly evaluate and adjust its procedures:

> Like many major businesses, we are, from time to time, a target of cyber-attacks and phishing schemes, and we expect these threats to continue. Because of the numerous and evolving cybersecurity threats, including advanced and persistent cyber-attacks, phishing and social engineering schemes, used to obtain unauthorized access, disable or degrade systems have become increasingly more complex and sophisticated and may be difficult to detect for periods of time, we may not anticipate these acts or respond adequately or timely. As these threats continue to evolve and increase, we may be required to devote significant additional resources in order to modify and enhance our security controls and to identify and remediate any security vulnerabilities.[18]

30.    As such, Defendant identified the risk of failing to detect an attack and the consequences of such a failure, including failure to respond adequately or on a timely basis. Additionally, Defendant identified the imminent risk inherent in a data breach and the duties a breach would trigger.

> A compromise of our data security that results in customer or donor personal or payment card data being obtained by unauthorized persons could adversely affect our reputation with our customers and others, as well as our operations, results of operations, financial

---

[17] *Id.* at 20.
[18] *Id.*

condition and liquidity and could result in litigation against us or the imposition of penalties. We might be required to expend significant capital and other resources to further protect against security breaches or to rectify problems caused by any security breach, including notification under data privacy laws and regulations and expenses related to remediating our information security systems. Even though we carry cyber-technology insurance policies that may provide insurance coverage under certain circumstances, we might suffer losses as a result of a security breach that exceed the coverage available under our insurance policies or for which we do not have coverage. A security breach and any efforts we make to address such breach could also result in a disruption of our operations, particularly our online sales operations.[19]

31.     Although Defendant identified these risks as its own, it demonstrates an acute awareness of the adverse effects that could result from a data breach, and, as such, apply to Plaintiffs and the other Class members.

Further, the existence of vulnerabilities, even if they do not result in a security breach, may harm client confidence and require substantial resources to address, and we may not be able to discover or remedy such security vulnerabilities before they are exploited, which may harm our business, reputation and future financial results.[20]

32.     Because of the highly sensitive and personal nature of the Private Information Defendant maintains, manages, and secures with respect to the "end users" of its clients, like that of the Plaintiffs here, Defendant has publicly affirmed its obligation and duty to secure Plaintiffs' data.

33.     Defendant's Privacy Policy North America ("Privacy Policy") expressly states:

At Blackbaud, we are committed to protecting your privacy. This [Privacy] Policy applies to Blackbaud's collection and use of personal data in connection with our marketing and provision of the Blackbaud Solutions, customer support and other services (collectively, the "Services"), for example if you are a customer, visit the website, interact with us at industry conferences, or work for a current or prospective customer of the Services.[21]

---

[19] *Id.*

[20] *Id.*

[21] Blackbaud, Inc., *Privacy Policy North America*, https://www.blackbaud.com/company/privacy-policy/north-america (last visited Jan. 11, 2021).

34.     Defendant further represents as follows with regard to the security of Personal

Information:

> We restrict access to personal information collected about you at our website to our employees, our affiliates' employees, those who are otherwise specified in this [Privacy] Policy or others who need to know that information to provide the Services to you or in the course of conducting our business operations or activities. While no website can guarantee exhaustive security, we maintain appropriate physical, electronic and procedural safeguards to protect your personal information collected via the website. We protect our databases with various physical, technical and procedural measures and we restrict access to your information by unauthorized persons. We also advise all Blackbaud employees about their responsibility to protect customer data and we provide them with appropriate guidelines for adhering to our company's business ethics standards and confidentiality policies. Inside Blackbaud, data is stored in password-controlled servers with limited access.[22]

35.     Defendant professes that its Privacy Policy is somehow supplanted by its clients:

> If you're a constituent, supporter, patient or student of one of our customers, to which we provide the Services, your data will be used in accordance with that customer's privacy policy. In providing the Services, Blackbaud acts as a service provider and thus, this [Privacy] Policy will not apply to constituents of our customers.[23]

36.     Defendant cannot absolve itself from its obligation or duty based on assertion of a

lack of privity, simply by arguing, as it did in a recent SEC filing, for example, that "plaintiffs lack

contractual privity with us."[24]

37.     The duty to protect Plaintiffs' Private Information is non-delegable, particularly

here where Defendant's entire business model is premised upon voluntarily assuming the duty via

soliciting customers to utilize its professed ability to manage, house, and safeguard data. Plaintiffs

allege that under any privacy policy, Defendant is liable for the removal of this data.

---

[22] *Id.*
[23] *Id.*
[24] Blackbaud, Inc., Form 10-Q at 20 (Nov. 3, 2020), https://investor.blackbaud.com/static-files/b861e404-fa85-4f5b-a833-bc30de0165dd.

38.     Given the magnitude of the risk and repercussions of a breach or attack targeting this type of data, the likelihood of a breach or attack, and Defendant's explicit awareness of these vulnerabilities, Defendant should have taken every precaution in protecting Plaintiffs' and the other Class members' Private Information, or at least employed "appropriate" safeguards as it pledged in its Privacy Policy. However, Defendant failed to employ adequate safeguards, leaving the sensitive Private Information in its possession exposed to unauthorized access. This is especially concerning since Defendant serves many non-profit organizations, which depend on donor contributions, such as those of Plaintiffs, to fund their operations, which ultimately placed the donors' data at risk of unauthorized exposure and misuse.

39.     Despite its duties, representations, and promises, Defendant failed to adequately secure and protect its clients, including the numerous non-profits, such as the respective organizations which maintained Plaintiffs' and the other Class members' Private Information, by allowing the Private Information to be accessed, copied, and potentially used or sold at a later date.

40.     Further, due to HIPAA, Defendant had additional obligations to secure patient users' information for healthcare clients.

41.     Defendant further failed Plaintiffs and the other Class Members by failing to adequately notify them of the ransomware attack and the resulting Data Breach or provide any remedy other than belated and facially inadequate notice.

## THE DATA BREACH

42.     Prior to the ransomware attack and Data Breach, Plaintiffs and other Class members provided sensitive and personally-identifying Private Information to Defendant as part of, *inter alia*, participating in fundraising by non-profit companies, seeking healthcare from healthcare providers, seeking education from K-12 school providers and universities, or seeking other

13

services from Defendant's clients. When providing such information, these individuals had the expectation that Defendant, as the manager and securer of this Private Information, would maintain security against cybercriminals and cyberattacks.

43.    Defendant maintained Plaintiffs' and the other Class members' data on a shared network, server, and/or software. Despite its own awareness of steady increases of cyberattacks on health care providers, schools, and other facilities over the course of recent years, Defendant did not maintain adequate security of Plaintiffs' and the other Class members' data, or adequately protect it against hackers and cyberattacks.

44.    According to its own statements, posted to its website in July 2020, Defendant initially discovered a ransomware attack in May of 2020.[25] The attack attempted to "disrupt the business by locking companies out of their own data and servers."[26] According to Defendant's statements:

> After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment. **The cybercriminal did not access credit card information, bank account information, or social security numbers.** Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly. . . . The subset of customers who were part of this incident have been notified and supplied with additional information and resources. We apologize that this happened and will continue to do our very best to supply help and support as we and our customers jointly navigate this cybercrime incident.[27]

---

[25] *Supra* note 7.

[26] *Id.*

[27] Blackbaud, Inc., *Security Incident* (July 19, 2020), https://www.blackbaud.com/securityincident [https://web.archive.org/web/20200719170537/https://www.blackbaud.com/securityincident] (emphasis added). Notably the language in bold has since been removed.

45.    The ransomware attack that began in February of 2020 and continued until May of 2020 led to the removal of one or more copies of a subset of the accessed data.

46.    Although Defendant claims that credit card information or bank account information was not accessed, the Notices that Plaintiffs received, advise individuals whose Private Information was accessed to, *inter alia*, "remain vigilant over the next twelve to twenty-four months for any strange inquiries, including potential phishing attempts," and report "any suspicious activity or suspected identity theft." Furthermore, one Notice furnished to Plaintiff Case advised that the organization "cannot be completely certain" that Defendant was indeed able to retrieve the stolen data. Similarly, Plaintiff Molnar received a Notice that warned "we cannot determine with certainty that the [i]nformation will not be misused." This Notice also advised that "[u]nfortunately, the cybercriminal removed a copy of the backup files of many of its customers, including our backup file that may have contained your personal information." Accordingly, Defendant's statements of reassurance were unfounded, in light of, *inter alia*, Defendant's earlier admission to the SEC that: "further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, [S]ocial [S]ecurity numbers, usernames and/or passwords."[28]

47.    Defendant did not have a sufficient process or policies in place to prevent cyberattack and access, which is evident by its own statements that it has "already implemented changes to prevent this specific issue from happening again."[29]

---

[28] *Supra* note 4 at 2.
[29] *Supra* note 7.

48.   The acknowledged types of data exposed included Plaintiffs' Private Information, such as Plaintiffs' and the other Class members' names, addresses, phone numbers, email addresses, dates of birth, and/or Social Security numbers.

49.   Defendant should not be allowed to reasonably rely on the word of cyber criminals that the "copied" or stolen subset of any data was destroyed. Defendant has not and cannot be assured that Social Security numbers, bank account numbers, and credit card numbers were not also accessed and retained by the data thieves, or it would not have advised its clients to advise affected individuals to monitor accounts for suspicious activity and/or identity theft. Despite recognizing the need for ongoing monitoring due to significant heightened risk, Defendant has offered no remuneration in the event of an actual identity theft or misuse.

50.   Despite having knowledge of the attack and compromised stolen data since at least May 2020, Defendant willfully and knowingly withheld this knowledge from its affected clients and their constituents who were victims of the fraud until mid-July or August 2020.

51.   Defendant has obligations and duties created by state and federal law, contracts, industry standards, common law, and representations made to the clients who entrusted Plaintiffs' and others' data to Defendant's care to keep Private Information secure, confidential, and protected from unauthorized access and disclosure.

52.   Indeed, cyberattacks have become so notorious that as recently as November 2019, the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issued warnings to potential targets like Defendant, so they are aware of, and prepared for, a potential attack.[30]

---

[30] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (emphasis added).

16

53.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including by Defendant's own admissions in its 2019 Annual Report.[31]

54.     Defendant breached its obligations to Plaintiffs and the other Class members, and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard Defendant's computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.  Failing to adequately protect consumers' Private Information;

    c.  Failing to properly monitor its own data security systems for existing intrusions;

    d.  Failing to timely notify its Clients, Plaintiffs, and the other Class members of the data breach; and

    e.  In other such ways yet to be discovered.

55.     As the result of Defendant's failure to take certain measures to prevent the attack before it occurred, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and the other Class members' Private Information.

56.     Accordingly, as outlined below, Plaintiffs' daily life was disrupted, and Plaintiffs and the other Class members face an increased risk of fraud and identity theft.

---

[31] 2019 Form 10-K at 20.

## CYBERATTACKS AND DATA BREACHES CAUSE DISRUPTION AND PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTIFY THEFT

57.     Cyberattacks and data breaches of medical facilities, educational and religious institutions, and non-profit entities are especially problematic because of the disruption they cause to the overall daily lives of individuals affected by the attack.

58.     Perhaps most illustrative of the danger that can be caused by cyberattacks on medical facilities, the first known death from a cyberattack was recently reported in Germany after a ransomware attack crippled a hospital's systems and they were forced to turn away emergency patients.[32]

59.     The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[33]

60.     The Federal Trade Commission ("FTC") recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

---

[32] Melissa Eddy & Nicole Perlroth, *Cyber Attack Suspected in German Woman's Death*, N.Y. Times (Sept. 18, 2020), https://www.nytimes.com/2020/09/18/world/europe/cyber-attack-germany-ransomeware-death.html.

[33] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2 (June 2007), https://www.gao.gov/assets/270/262899.pdf.

[34] FTC, *Identity Theft Recovery Steps*, https://www.identitytheft.gov/Steps (last visited Jan. 12, 2021).

61.     Cyber criminals use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

62.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's Private Information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[35]

---

[35] Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (updated Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php [https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php] (last visited Jan. 12, 2021).



63.     Private Information is a valuable property right.[36] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. This obvious risk to reward analysis illustrates that Private Information have considerable market value that is diminished when it is compromised.

64.     It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen

---

[36] *See, e.g.*, John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *1 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.")

data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[37]

Private Information is such an inherently valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black-market for years.

65.    There is a strong probability that entire batches of stolen information as a result of the Data Breach have yet to be dumped on the black market, meaning Plaintiffs and the other Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, as the respective Notices advise, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

## PLAINTIFFS' AND THE OTHER CLASS MEMBERS' DAMAGES

66.    Plaintiffs and the other Class members have been damaged by the compromise of their Private Information in the Data Breach. Plaintiffs' Private Information was compromised as a direct and proximate result of the Data Breach. While the compromise of this information was known as early as May of 2020, Plaintiffs did not receive their respective Notices until July of 2020 at the earliest.

67.    At all relevant times, Plaintiff Simkins has been a supporter of a number of non-profit organizations that utilize Blackbaud's fundraising and donor engagement software. In order to make her contributions, Plaintiff Simkins was required to provide Private Information to each of these non-profits, which, in turn, relied upon Defendant to secure and maintain this Private Information.

---

[37] GAO Report at 28-29.

68.    On July 17, 2020, one of these non-profits advised Plaintiff Simkins that "the cybercriminal removed a copy of an August 2019 [organization] backup donor file containing your personal information." The non-profit further advised Plaintiff Simkins that "Blackbaud has determined that the file removed may have contained your name; contact information from August 2019, including telephone numbers, email addresses, and mailing addresses; and a history of your relationship with our organization up to that point, such as donation dates and amounts."

69.    On July 24, 2020, yet another non-profit, advised Plaintiff Simkins that "the hackers obtained some personally identifying information about Blackbaud's nonprofit clients' donors and prospective donors, including those of the [non-profit]." The non-profit noted that while "Blackbaud believes they have successfully retrieved the stolen data," it "cannot be completely certain this is the case." The non-profit also advised that its "contractual agreements have always required Blackbaud to keep our constituent information confidential and to have security procedures in place to minimize breaches." Additionally, the non-profit advised Plaintiff Simkins that "[i]n all candor, we are frustrated with the lack of information we've received from Blackbaud about this incident thus far."

70.    On September 21, 2020, a liberal arts college to which Ms. Simkins had previously donated notified Ms. Simkins that it contracts with Defendant "to support alumni and donor engagement and development activities," and that it "was one of many clients impacted by the [Data Breach]." The college also advised Plaintiff Simkins that it had determined that the stolen file may have contained demographic data "as well as information pertaining to your relationship with [the college], including philanthropic giving history."

71.    Subsequent to the Data Breach, in December of 2020, Plaintiff Simkins became a victim of credit card fraud. Specifically, Plaintiff Simkins' credit card was fraudulently used

without her authorization for an Amazon Prime purchase. As a result of the fraudulent transaction, Plaintiff Simkins' credit card account at issue had to be closed, while the replacement credit card was being re-issued. In addition to the loss of the use of and access to her credit card account that was used without her authorization, Plaintiff Simkins had to, *inter alia*, expend significant time and efforts addressing the fraudulent transaction, in order to, among other things, close her credit card account used without her authorization, obtain the refund for the fraudulent transaction, and request a replacement credit card to be re-issued in lieu of the card that was fraudulently used.

72.     Likewise, Plaintiff Case has also been a supporter of a number of non-profit organizations that use the Defendant's services for fundraising activities. In order to make her contributions, Plaintiff Case was required to provide Private Information to each these non-profits, which, in turn, relied upon Defendant to secure and maintain this Private Information.

73.     On July 24, 2020, Plaintiff Case was advised by one such non-profit (which was also supported by Plaintiff Simkins), that "the hackers obtained some personally identifying information about Blackbaud's nonprofit clients' donors and prospective donors, including those of the[non-profit]." The non-profit noted that "Blackbaud believes they have successfully retrieved the stolen data, but we cannot be completely certain this is the case." It also advised that its "contractual agreements have always required Blackbaud to keep our constituent information confidential and to have security procedures in place to minimize breaches." Furthermore, the non-profit advised Plaintiff Case that "[i]n all candor, we are frustrated with the lack of information we've received from Blackbaud about this incident thus far."

74.     On August 14, 2020, a second non-profit notified Plaintiff Case that "[u]nfortunately, the criminal was able to remove a portion of the data stored on the company's servers," including "information about you and other donors, such as street addresses, phone

numbers, email addresses, and birth dates." The non-profit also advised that it was not notified by Defendant of the Data Breach until mid-July, and that "[t]o say the least, we find this delay unacceptable, and we are extremely dissatisfied with Blackbaud's lack of transparency around this incident."

75.     On July 17, 2020, yet another non-profit organization advised Plaintiff Case that it was "recently notified by our database service provider, Blackbaud Inc., of a security incident," and that "the cybercriminal removed a copy of an August 2019 [non-profit's] backup donor file containing your personal information." In particular, "Blackbaud has determined that the file removed may have contained your name; contact information from August 2019, including telephone numbers, email addresses, and mailing addresses; and a history of your relationship with our organization up to that point, such as donation dates and amounts."

76.     Plaintiff Case has also been a supporter of at least one educational institution that is a non-profit client of Defendant. In order to make her contributions to this entity, Plaintiff Case was required to provide Private Information to the college, which, in turn, relied upon Defendant to secure and maintain this Private Information. On September 21, 2020, the college notified Plaintiff Case that it contracts with Defendant "to support alumni and donor engagement and development activities," and that it "was one of many clients impacted by the [Data Breach]." The college further advised Plaintiff Case that it had determined that the stolen file may have contained demographic data, birth dates "as well as information pertaining to your relationship with [the college], including philanthropic giving history."

77.     Plaintiff Case has also been a supporter of an international charitable relief organization, a non-profit client of Defendant. On July 28, 2020, the charity advised Plaintiff Case of the Data Breach "that resulted in a hacker obtaining personally identifying information from the

databases of Blackbaud's clients." The relief organization further advised Plaintiff Case that it was investigating "the full extent of this security breach," and that "[i]n full transparency, we have been dissatisfied with the level of information provided by Blackbaud following this breach as the privacy and confidentiality of our supporters and the individuals we serve are of the utmost importance[.]"

78.    On August 2, 2020, a legal rights organization to which Plaintiff Case had previously donated advised her that it uses the Defendant's "donor engagement and data management platform," and that "hackers accessed some servers and removed copies of files that may have contained donor's personal identifying information from the business's nonprofit clients."

79.    Plaintiff Case has also been a supporter of an animal welfare organization that is a non-profit client of Defendant. In order to make her contributions, Plaintiff Case was required to provide Private Information to the non-profit, which, in turn, relied upon Defendant to secure and maintain this Private Information. On August 27, 2020, this non-profit advised Plaintiff Case that as a result of the Data Breach, "[a] file was removed that may have contained your contact details, demographic information, and a history of your relationship with [the organization] – such as donation dates and amounts."

80.    On July 26, 2020, yet another charity to which Plaintiff Case had donated, notified her that it "was one of many nonprofits and schools that were impacted by [the Data Breach]," and that certain "information about some of our donor family" was potentially exposed. The non-profit further advised Plaintiff Case to report "any suspicious activity or incidents of identity theft" related to the Data Breach to the non-profit and to the law enforcement authorities.

81.     On August 13, 2020, a museum to which Plaintiff Case had donated notified her that as a result of the Data Breach, "the cybercriminal removed a copy of our backup file containing your personal information." The museum further advised that "[t]his occurred at some point beginning on February 7, 2020 through May 20, 2020." In particular, the museum had "determined that the file removed may have contained your contact information, demographic information, and a history of your relationship with our organization, such as donation dates and amounts." The museum warned Plaintiff Case that she should "remain vigilant and promptly report any suspicious activity or suspected identity theft to the proper authorities." Subsequently, the museum advised Plaintiff Case on October 15, 2020, that, *inter alia*, Defendant "alerted us to a potential security risk after they were made aware of complications following the initial breach."

82.     On October 14, 2020, Plaintiff Case was notified by a community college foundation client of Defendant, that as a result of the Data Breach, her Private Information, "including names, mailing addresses, email addresses, and phone numbers may have been compromised."

83.     In total, Plaintiff Case received notices from at least ten different non-profit organizations regarding at least eleven separate instances in which her personal data had been placed at risk, compromised or stolen at the hands of Blackbaud.

84.     Subsequent to the Data Breach, on April 14, 2020, Plaintiff Case upgraded her TurboTax package to TurboTax MAX (an optional add-on package for any paid version of TurboTax Online that offers a variety of benefits and personalized assistance), upon filing her 2019 tax return. Plaintiff Case paid an annual fee of $50.00 for the upgrade to TurboTax Max. Among the benefits offered by TurboTax Max, is identity theft monitoring by IDnotify™ ("IDnotify"), a part of Experian®. As part of an upgrade to TurboTax Max, customers are promptly

26

notified by an email from IDnotify if their personal information has been compromised. On December 29, 2020, Plaintiff Case received such an Identity Protection notification from IDnotify, advising that "IDnotify continuously monitors your personal information and notifies you of any detected suspicious activity. IDnotify has detected suspicious activity involving your online personal information."[38] In particular, IDnotify advised Plaintiff Case that on December 20, 2020, "[y]our phone number has been found compromised online. We monitor online properties to identify the illegal trading and selling of your personal information, and unfortunately we have found a match that may indicate possible identity theft."[39] IDnotify further advised Plaintiff Case that "[y]our phone number can be used with other personally identifiable information (PII) elements to steal your identity."[40] Additionally, subsequent to the Data Breach, Plaintiff Case has changed a number of her online passwords saved through Google Chrome, upon being prompted to do so by Google.

85.     Plaintiff Molnar has also been a supporter of non-profit organizations that use the Defendant's services for fundraising activities. Among other things, Plaintiff Molnar has made recurring annual donations to a liberal arts college that is a client of Defendant. In order to make the donation, Plaintiff Molnar was required to provide Private Information to the college, which, in turn, relied upon Defendant to secure and maintain this Private Information. On January 11, 2021, in response to Plaintiff Molnar's inquiry concerning the Data Breach, the college advised Plaintiff Molnar "that the compromised file may have contained demographic data and information pertaining to your relationship with[the college], including philanthropic giving history."

---

[38] Ex. A at 1.
[39] Ex. B.
[40] *Id.*

86.     Additionally, Plaintiff Molnar has been a supporter of a non-profit charitable relief organization that is a client of Defendant. In order to make her contributions, Plaintiff Molnar was required to provide Private Information to the charity, which, in turn, relied upon Defendant to secure and maintain this Private Information. On December 23, 2020, the charity advised Plaintiff Molnar that it "uses Blackbaud-hosted databases to manage our fundraising data, and we are one of thousands of organizations that have been affected" by the Data Breach. The charity further informed Plaintiff Molnar that "the cybercriminal removed a copy of the backup files of many of its customers, including our backup file that may have contained your personal information." In particular, "the information contained in the backup file may have included your name, mailing address, phone numbers, email and giving history."

87.     As a result of the Data Breach, even if Plaintiffs used credit monitoring, the data thieves could conceivably wait another seven or more years to sell or use their Private Information without detection. Moreover, on information and belief, cyber-criminals may be able to cross-reference information obtained from this Data Breach with other data sources with an astonishingly complete scope and degree of accuracy to build valuable profiles on Plaintiffs and other members of the Class. Thus, Plaintiffs will require more than seven years of credit monitoring to ensure that their identity will be secure in the wake of this massive Data Breach.

88.     Upon information and belief, to date, Defendant has provided certain Class members with "Single Credit Bureau Monitoring," which provides data access to only one of the three national credit reporting bureaus, and only for a period of 24 months from the date of enrollment, while the threat to Plaintiffs' and the other Class members' credit or identity will continue for decades. Beyond this two-year window, Defendant offers these Class members no assistance or protection, even if identity theft occurs thereafter.

28

89.     Further, even if the Class members' credit is frozen, they will eventually need to unfreeze their credit in order to, among other things, obtain any car loans, obtain any mortgages, apply for jobs and various other tasks associated with building and strengthening their credit histories. Doing so will make the Class members vulnerable again in the future.

90.     Like Plaintiffs, the other Class members' Private Information was compromised as a direct and proximate result of the Data Breach.

91.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the other Class members have been placed at an imminent and continuing increased risk of harm from fraud and identity theft.

92.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the other Class members have been forced to expend time dealing with the effects of the Data Breach.

93.     Plaintiffs and the other Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their name, credit card fraud, and similar identity theft.

94.     Plaintiffs and the other Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs.

95.     Plaintiffs and the other Class members will incur out-of-pocket costs for protective measures such as on-going credit monitoring fees, and may also incur additional costs for credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

96.     Plaintiffs and the other Class members also suffered a loss of value of their Private Information when it was removed and acquired by cyber thieves in the Data Breach.

97.     Plaintiffs and the other Class members have spent and will continue to spend significant amounts of time to respond to the Data Breach and monitor their financial, student, and/or medical accounts and records for misuse.

98.     Plaintiffs and the other Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiffs and the other Class members have and will suffer ascertainable losses in the form of out-of-pocket expenses and/or the loss of the value of their time spent in reasonably acting to remedy or mitigate the effects of the Data Breach relating to:

     a.  Finding fraudulent charges;

     b.  Canceling and reissuing credit and debit cards;

     c.  Addressing their inability to withdraw funds linked to compromised accounts;

     d.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

     e.  Placing "freezes" and "alerts" with credit reporting agencies;

     f.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

     g.  Contacting financial institutions and closing or modifying financial accounts;

     h.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

     i.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled;

     j.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come; and

     k.  Interacting with government agencies and law enforcement to address the impact and harm caused by this breach.

99.     Moreover, Plaintiffs and the other Class members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further

breaches by the implementation of security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing Plaintiffs' and the other Class members' data is not accessible online and that access to such data is limited and secured.

100. As a result of Defendant's failures to safeguard Plaintiffs' data, Plaintiffs and the other Class members are forced to live with the knowledge that their Private Information—which contains private and personal details of their life—may be disclosed to the entire world, thereby making them vulnerable to cyber criminals, permanently subjecting them to loss of security, and depriving Plaintiffs and the other Class members of their fundamental right to privacy.

101. As many of the purchasers of Private Information may not utilize the stolen information immediately, Plaintiffs and the other Class members will be forced for long periods of time to endure the fear of whether and how such information will be used against them.

102. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and the other Class members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of harm.

## **CLASS ACTION ALLEGATIONS**

103. Plaintiffs bring this action on their own behalf and on behalf of all natural persons similarly situated.

104. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> Nationwide Class: All natural persons residing in the United States whose Private Information was compromised as a result of the Blackbaud data breach.

105. Plaintiffs also propose the following Subclass definitions, subject to amendment as appropriate:

Washington Subclass: All natural persons residing in Washington whose Private Information was compromised as a result of the Blackbaud data breach.

Wyoming Subclass: All natural persons residing in Wyoming whose Private Information was compromised as a result of the Blackbaud data breach.

106.    Excluded from the Class and Subclasses are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class and Subclasses are members of the judiciary to whom this case is assigned, their families and members of their staff.

107.    <u>Numerosity</u>. The members of the Class (and Subclasses) are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of approximately hundreds of thousands of persons and entities whose data was compromised in the Data Breach.

108.    <u>Commonality</u>. There are questions of law and fact common to Plaintiffs and the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

      a.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and the other Class members' Private Information;

      b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

      c.  Whether Defendant truthfully represented the nature of its security systems, including their vulnerability to hackers;

      d.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

      e.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

f.   Whether Defendant owed a duty to Class members to safeguard their Private Information;

g.   Whether Defendant breached its duty to Class members to safeguard their Private Information;

h.   Whether computer hackers obtained, sold, copied, stored or released Class members' Private Information;

i.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

j.   Whether the Class members suffered legally cognizable damages as a result of Defendant's misconduct;

k.   Whether Defendant's conduct was negligent;

l.   Whether Defendant's conduct was *per se* negligent;

m.   Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

n.   Whether Defendant failed to provide accurate and complete notice of the Data Breach in a timely manner; and

o.   Whether the Class members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

109.   Typicality. Plaintiffs' claims are typical of those of the other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach.

110.   Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

111.   Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members, in that all Plaintiffs' and the other Class members' data at issue here was stored on the same computer systems and allowed to be unlawfully accessed in the

same way. The common issues arising from Defendant's conduct affecting Class members, as described *supra*, predominate over any individualized issues. Adjudication of the common issues in a single action has important and desirable advantages of judicial economy.

112.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

113.    Defendant has acted on grounds that apply generally to the Class (and Subclasses) as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

**<u>FOR A FIRST CAUSE OF ACTION</u>**
**NEGLIGENCE**
**(On Behalf of Plaintiffs, the Nationwide Class, the Washington Subclass,**
**and the Wyoming Subclass Members)**

114.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 113 above, as if fully set forth herein.

115.    Defendant's clients required Plaintiffs and the other Class members to submit non-public personal information in order to make charitable contributions to non-profit organizations,

34

and/or obtain medical, educational, and other services. Defendant had a duty to Class members to securely maintain the Private Information collected as promised and warranted.

116. By voluntarily accepting the duty to maintain and secure this data, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer systems—and Plaintiffs' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from cyber theft. Defendant's duty included a responsibility to implement systems and processes by which it could detect and prevent a breach of its security systems in an expeditious manner and to give prompt notice to those affected by a data breach and/or ransomware attack.

117. Defendant owed a duty of care to Plaintiffs to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected and safeguarded the Private Information of the Class.

118. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Class members, the end users of the services Defendants provided to its clients, which is recognized by Defendant's Privacy Policy, as well as applicable laws and regulations. Defendant actively solicited Private Information as part of its business and was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a ransomware attack and resulting data breach.

119. Defendant had a specific duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

120.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

121.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect the Class members' data. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b.  Failing to adequately monitor the security of its networks and systems;

c.  Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.  Allowing unauthorized access to Class members' Private Information;

e.  Failing to detect in a timely manner that Class members' Private Information had been compromised; and

f.  Failing to timely notify Class members about the Data Brach so those put at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages.

122.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

123.    It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

124.    Plaintiffs are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

125.    Plaintiffs are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate credit monitoring to all Class members, and any other relief this Court deems just and proper.

### FOR A SECOND CAUSE OF ACTION
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs, the Nationwide Class, the Washington Subclass,**
**and the Wyoming Subclass Members)**

126.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 125 above, as if fully set forth herein.

127.    When Plaintiffs and the other Class members provided their Private Information to Defendant and Defendant's clients in exchange for Defendant and Defendant's clients' services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

128.    Defendant solicited and invited Class members to provide their Personal Information as part of Defendant's regular business practices, including through its Privacy Policy. Plaintiffs and the other Class members accepted Defendant's offers and provided their data to Defendant.

129.    In entering into such implied contracts, Plaintiffs and the other Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

130.    Plaintiffs and the other Class members made payments to Defendant's clients, such as through fundraising activities, at least a part of which was conferred upon Defendant. Plaintiffs reasonably believed and expected that Defendant would use part of those funds to maintain adequate data security. Defendant failed to do so.

131.    Plaintiffs and the other Class members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep that information secure. Plaintiffs and the other Class members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

132.    Plaintiffs and the other Class members fully and adequately performed their obligations under the implied contracts with Defendant.

133.    Defendant breached its implied contracts with Plaintiffs and the other Class members by failing to safeguard and protect their data.

134.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiffs and the other Class members sustained damages as alleged herein.

135.    Plaintiffs and the other Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

136.    Plaintiffs and the other Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

## FOR A THIRD CAUSE OF ACTION
### NEGLIGENCE *PER SE*
**(On Behalf of Plaintiffs, the Nationwide Class, the Washington Subclass, and the Wyoming Subclass Members)**

137.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 136, above as if fully set forth herein.

138.   Pursuant to the FTCA, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the other Class members' Private Information.

139.   Pursuant to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, Defendant had a duty to protect the security and confidentiality of Plaintiffs' and the other Class members' Private Information.

140.   Defendant breached its duties to Plaintiffs and the other Class members under the FTCA and the GLBA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the other Class members' Private Information.

141.   Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

142.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and the other Class members, Plaintiffs' and the other Class members' data would not have been stolen and they would not have been harmed.

143.   The injury and harm suffered by Plaintiffs and the other Class members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and the other Class members to experience the foreseeable harms associated with the exposure of their Private Information, including increased risk of identity theft.

144.   As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and the other Class members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## FOR A FOURTH CAUSE OF ACTION
## VIOLATION OF THE WASHINGTON DATA DISCLOSURE LAW, RCW §§ 19.255.010-020
## (On Behalf of Plaintiffs Simkins and Case, and Washington Subclass Members)

145.     Plaintiffs Simkins and Case, individually and on behalf of the Washington Subclass members, re-allege and incorporate by reference Paragraphs 1 through 144 above, as if fully set forth herein.

146.     Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information includes "Personal Information" as defined by RCW § 19.255.005.

147.     Defendant is a business that owns or licenses computerized data that includes "Personal Information" as defined by RCW § 19.255.005.

148.     Pursuant to RCW § 19.255.005, "breach of the security of the system," means "unauthorized acquisition of data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

149.     Defendant is required to accurately notify Plaintiffs Simkins and Case and the Washington Subclass members if it becomes aware of a breach of its data security system "in the most expedient time possible" and "without unreasonable delay" under RCW § 19.255.010.

150.     Because Defendant was aware of a breach of its security system, it had an obligation to disclose the Data Breach in full and timely fashion as mandated by RCW § 19.255.010.

151.     By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated RCW § 19.255.010.

152.     As a direct and proximate result of Defendant's violations of RCW § 19.255.010, Plaintiffs Simkins and Case, and the Washington Subclass members suffered damages, as described above.

153.     Plaintiffs Simkins and Case, and the Washington Subclass members seek relief as permitted by law, including actual damages and equitable relief.

**FOR A FIFTH CAUSE OF ACTION**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT,**
**RCW § 19.86,** *et seq.*
**(On Behalf of Plaintiffs Simkins and Case, and Washington Subclass Members)**

154.     Plaintiffs Simkins and Case, individually and on behalf of the Washington Subclass members, re-allege and incorporate by reference Paragraphs 1 through 153 above, as if fully set forth herein.

155.     Defendant is a "person" within the meaning of the Washington Consumer Protection Act, RCW § 19.86.010(1), and conducts "trade" and "commerce" within the meaning of RCW § 19.86.010(2).

156.     Plaintiffs Simkins and Case and the Washington Subclass members are "persons" within the meaning of RCW § 19.86.010(1).

157.     Defendant engaged in unfair and/or deceptive acts or practices in the course of its trade or business, in violation of RCW § 19.86.020, including:

     a.     Knowingly making a false representation as to the characteristics of its products and services; and

     b.     Representing that its services are of a particular standard, quality, or grade, though Defendant knew or should have known that they were otherwise.

158.     Defendant's unfair and/or deceptive acts or practices committed in the course of its trade or business include:

     a.     Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

     b.     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and

41

privacy measures, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*;

f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Simkins and Case's and the Washington Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*

159.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

160.    Defendant intended to mislead Plaintiffs Simkins and Case and the Washington Subclass members and induce them to rely on its misrepresentations and omissions.

161.    Had Defendant disclosed to Plaintiffs Simkins and Case and the Washington Subclass members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable

data security measures and comply with the law. Instead, Defendant was trusted with sensitive and valuable Private Information regarding hundreds of thousands of consumers, including Plaintiffs Simkins and Case and the Washington Subclass. Defendant accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because Defendant held itself out as maintaining a secure platform for Private Information data, Plaintiffs Simkins and Case and the Washington Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

162.    Defendant acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiffs Simkins and Case's and the Washington Subclass members' rights.

163.    Defendant's failure to safeguard Plaintiffs Simkins and Case's and the Washington Subclass members' Personal Information compromised in the Data Breach constitutes an unfair and/or deceptive act or practice that offends public policy, including as set forth in RCW §§ 19.86.020 and 19.86.093.

164.    Defendant's failure to promptly and fully notify Plaintiffs Simkins and Case and the Washington Subclass members regarding the Data Breach is unfair and/or deceptive because these acts or practices offend public policy and omit to disclose material information timely to Plaintiffs Simkins and Case and the Washington Subclass members, including as set forth in RCW §§ 19.86.020 and 19.86.093.

165.    Defendant's failure to safeguard Plaintiffs Simkins and Case's and the Washington Subclass members' Personal Information compromised in the Data Breach, and its failure to provide timely and complete notice of that Data Breach to the victims, resulted in substantial injury

to Plaintiffs Simkins and Case and the Washington Subclass members, is not outweighed by any countervailing benefits to consumers, and is not reasonably avoidable by consumers.

166.    Defendant's failure to safeguard Plaintiffs Simkins and Case's and the Washington Subclass members' Personal Information compromised in the Data Breach, and its failure to provide timely and complete notice of that Data Breach to the victims, is unfair and or deceptive within the meaning of RCW §§ 19.86.020 and 19.86.093 because these acts and/or practices are immoral, unethical, oppressive, and/or unscrupulous.

167.    Defendant's unfair or deceptive practices occurred in its trade or business and have and are capable of injuring a substantial portion of the public. Defendant's course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

168.    As a direct and proximate result of Defendant's unfair or deceptive trade practices, Plaintiffs Simkins and Case and the Washington Subclass members suffered injuries to their legally protected interests, including their legally protected interest in the confidentiality and privacy of their Private Information.

169.    Plaintiffs Simkins and Case and the Washington Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief; actual damages; treble damages pursuant to RCW § 19.86.090; costs of suit, including reasonable attorneys' fees and costs; and such further relief as this Court may deem proper.

**FOR A SIXTH CAUSE OF ACTION**
**COMPUTER SECURITY BREACH; NOTICE TO AFFECTED PERSONS,**
**Wyo. Stat. Ann. §§ 40-12-502(a), *et seq.***
**(On Behalf of Plaintiff Molnar, and Wyoming Subclass Members)**

170.    Plaintiff Molnar, individually and on behalf of the Wyoming Subclass members, re-alleges and incorporates by reference Paragraphs 1 through 169 above, as if fully set forth herein.

171.    Plaintiff Molnar's and the Wyoming Subclass members' Private Information includes "Personal Information" as defined by Wyo. Stat. Ann. § 40-12-501.

172.    Defendant is a business that owns or licenses computerized data that includes "Personal Information" as defined by Wyo. Stat. Ann. § 40-12-501.

173.    Pursuant to Wyo. Stat. Ann. § 40-12-501(a)(i), "[b]reach of the security of the data system" means "unauthorized acquisition of computerized data that materially compromises the security, confidentiality or integrity of personal identifying information maintained by a person or business and causes or is reasonably believed to cause loss or injury to a resident of this state."

174.    Defendant is required to accurately notify Plaintiff Molnar and the Wyoming Subclass members if it becomes aware of a breach of its data security system "in the most expedient time possible and without unreasonable delay" under Wyo. Stat. Ann. § 40-12-502(a).

175.    Because Defendant was aware of a breach of its security system, it had an obligation to disclose the Data Breach in a full and timely fashion as mandated by Wyo. Stat. Ann. § 40-12-502(a).

176.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Wyo. Stat. Ann. § 40-12-502(a).

177.    As a direct and proximate result of Defendant's violations of Wyo. Stat. Ann. § 40-12-502(a), Plaintiff Molnar, and the Wyoming Subclass members suffered damages, as described above.

178.    Plaintiff Molnar, and the Wyoming Subclass members seek relief as permitted by law, including actual damages and equitable relief.

**FOR A SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT,**
**Wyo. Stat. Ann. § 40-12-101,** *et seq.*
**(On Behalf of Plaintiff Molnar, and Wyoming Subclass Members)**

179.    Plaintiff Molnar, individually and on behalf of the Wyoming Subclass members, re-alleges and incorporates by reference Paragraphs 1 through 178 above, as if fully set forth herein.

180.    Defendant is a "person" within the meaning of the Washington Consumer Protection Act, Wyo. Stat. Ann. § 40-12-102(a)(i), and conducts "consumer transactions" within the meaning of Wyo. Stat. Ann. § 40-12-102(a)(ii).

181.    Plaintiff Molnar and the Wyoming Subclass members are "persons" within the meaning of Wyo. Stat. Ann. § 40-12-102(a)(i).

182.    Defendant engaged in unlawful deceptive trade practices in the course of its business, in violation of Wyo. Stat. Ann. § 40-12-105, including:

      a.    Knowingly making a false representation as to the characteristics of its products and services;

      b.    Representing that its services are of a particular standard, quality or grad, though Defendant knew or should have known that they were otherwise; and

      c.    Representing that its services are available to the consumers for a reason that does not exist.

183.    Defendant's unfair or deceptive trade practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Molnar's and the Wyoming Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Molnar and the Wyoming Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff Molnar and the Wyoming Subclass members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Molnar and the Wyoming Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Molnar's and the Wyoming Subclass members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Molnar and the Wyoming Subclass members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*

184.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

185.  Defendant intended to mislead Plaintiff Molnar and the Wyoming Subclass members and induce them to rely on its misrepresentations and omissions.

186.  Had Defendant disclosed to Plaintiff Molnar and the Wyoming Subclass members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been

unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant was trusted with sensitive and valuable Private Information regarding hundreds of thousands of consumers, including Plaintiff Molnar and the Wyoming Subclass. Defendant accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because Defendant held itself out as maintaining a secure platform for Private Information data, Plaintiff Molnar and the Wyoming Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered

187.    Defendant acted intentionally, knowingly, and maliciously to violate Wyoming's Consumer Protection Act, and recklessly disregarded Plaintiff Molnar and the Wyoming Subclass members' rights.

188.    As a direct and proximate result of Defendant's unfair or deceptive trade practices, Plaintiff Molnar and the Wyoming Subclass members suffered injuries to their legally protected interests, including their legally protected interest in the confidentiality and privacy of their Private Information.

189.    Plaintiff Molnar and the Wyoming Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, and reasonable attorneys' fees and costs pursuant to Wyo. Stat. Ann. § 40-12-108; and such further relief as this Court may deem proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

   A. For an Order certifying this action as a class action and appointing Plaintiffs and
      their Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the other Class members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and the other Class members or to mitigate further harm;

C. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. Ordering Defendant to pay for not less than seven years of credit monitoring services for Plaintiffs and the proposed Class;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including reasonable expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated this 10th of February, 2021          Respectfully submitted,

**KELLER ROHRBACK L.L.P.**

*/s/ Gretchen Freeman Cappio*
Gretchen Freeman Cappio (*pro hac vice* forthcoming)
Juli E. Farris (*pro hac vice* forthcoming)
Cari Campen Laufenberg (*pro hac vice* forthcoming)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
Email: gcappio@kellerrohrback.com
        jfarris@kellerrohrback.com
        claufenberg@kellerrohrback.com

Alison E. Chase (*pro hac vice* forthcoming)
**KELLER ROHRBACK L.L.P.**
801 Garden St., Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1962
Fax: (206) 456-1497
Email: achase@kellerrohrback.com

Tanya Korkhov (*pro hac vice* forthcoming)
**KELLER ROHRBACK L.L.P.**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Tel.: (646) 380-6693
Fax: (646) 380-6692
Email: tkorkhov@kellerrohrback.com

*/s/ Marlon E. Kimpson*
Marlon E. Kimpson (SC Bar No. 17042)
Jodi Westbrook Flowers (SC Bar No. 066300)
Mathew Jasinski (*pro hac vice* forthcoming)
Andrew P. Arnold (SC Bar No. 102491)
Tammy C. Rivers (SC Bar No. 102812)
C. Ross Heyl (SC Bar No. 104154)
**MOTLEY RICE LLC**

28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel.: (843) 216-9000
Fax: (843) 216-9027
Email: mkimpson@motleyrice.com
      jflowers@motleyrice.com
      mjasinski@motleyrice.com
      aarnold@motleyrice.com
      rheyl@motleyrice.com
      tcrivers@motleyrice.com

*Attorneys for Plaintiffs and the Proposed Class*